IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**GEORGIA M. DUNCAN,**

       **Plaintiff,**

vs.                                                    **No.  03cv1002 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Duncan's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 11]**, filed January 29, 2004, and fully briefed on April 7, 2004.  On March 25, 2003, the Commissioner of Social Security issued a final decision denying Duncan's claim for supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse and remand is not well taken and will be DENIED.

### I.  Factual and Procedural Background

Duncan, now forty-three years old, filed her application for supplemental security income benefits on August 3, 2001, alleging disability since January 1, 1999, due to headaches, back pain and arm pain.  Tr. 14.  Duncan has some college education and no vocationally relevant past work experience.  *Id.*  On March 25, 2003, the ALJ denied benefits, finding "[t]he medical evidence indicates that [Duncan] has degenerative changes in the lumbar and thoracic spine, morbid obesity, hypertension, hypothyroidism, status post carpal tunnel release, possible osteoporosis and

osteoarthritis, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Tr. 15. The ALJ further found Duncan retained the residual functional capacity (RFC) to lift 10 pounds occasionally, sit for two hours at a time, up to six hours per day, and perform the occasional standing and walking required for sedentary work. Tr. 16. As to her credibility, the ALJ found Duncan was not a fully credible witness. Tr. 19. Duncan filed a Request for Review of the decision by the Appeals Council. On August 11, 2003, the Appeals Council denied Duncan's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Duncan seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Duncan makes the following arguments: (1) the ALJ's residual functional capacity determination is contrary to the evidence and the law; and (2) the ALJ's credibility finding is contrary to law.

**A.  Residual Functional Capacity Determination**

Residual functional capacity (RFC) is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.*  The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.*  "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

Duncan contends the ALJ's RFC finding that she could perform a full range of sedentary work is contrary to the evidence and the law.  Pl.'s Mem. in Support of Mot. to Reverse at 11. According to Duncan, in determining her RFC "the ALJ <u>relied on only two parts of the record</u>: a physical therapy notation and the opinion of the non-examining DDS physician." *Id.* (emphasis

4

added). Duncan asserts the physical therapist's report "simply does not support a residual functional capacity finding, at any level." *Id*. at 12. As to the opinion of the non-examining DDS physician, Duncan claims his opinion is not "substantial evidence and his findings are suspect." *Id.* In his decision, the ALJ found:

> In February 1999 the claimant was treated for asthmatic bronchitis (Ex. 3F/17). In June 1999 she was found to have low back pain with minimal muscle spasm (Ex. 3F/16). Subsequent X-rays showed minimal degenerative change in the thoracic and lumbar spine with possible muscle spasm (Ex. 1F/6). She was very obese, weighing 281 pounds at 62 inches tall (Ex. 2F/4). In July 2001 she complained of headaches and visual problems. An MRI of her brain showed only some sinus disease (Ex. 1F/8). Her visual fields were normal and all neurological tests were likewise normal (Exs. 3F/3 and 13F). Her thyroid tests continued to be abnormal, but this was though (sic) to be due to non-compliance (Ex. 3F/2). In August 2002 she had carpal tunnel release surgery on the right, which was successful (Ex. 12F). She was under treatment for depression. Her hypertension was inadequately controlled (Ex. 12F). She was suspected to have sleep apnea and osteoporosis and additional testing was requested and her medication were changed (Ex. 12F). She was evaluated for increasing asthmatic symptoms in December 2002 and given additional medication (Ex. 13F).
>
> The medical evidence indicates that the claimant has degenerative changes in the lumbar and thoracic spine, morbid obesity, hypertension, hypothyroidism, status post carpal tunnel release, possible osteoporosis and osteoarthritis, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. She does not have evidence of nerve root compression to comprot (sic) with the severity contemplated by 1.04A. She does not have pulmonary function testing or frequency of attacks necessary to satisfy § 3.03. She does not have any gross anatomical deformity of her joints to comport with the severity contemplated by § 1.02. Her carpal tunnel release on the right was successful, and the record does not establish disorganization of motor function as required by § 11.14. The claimant has failed to establish that her impairments, even in combination, meet or equal the requirements of any listed impairment.
>
> A determination must therefore be made whether she retains the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. The term 'residual functional capacity' is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 C.F.R. § 416.945 and Social Security Ruling 96-8p).
>
> The claimant cares for her mother who uses a wheelchair. She experiences back pain due to pushing her mother, who weighs 380 pounds, in the wheelchair (Ex. 2F/4). She also cares for her 14-year-old son, who has a seizure disorder and receives SSI due to his

> impairment. The claimant says she has irritable bowel syndrome, but has not established any medically determinable gastrointestinal impairment. She says that she was prescribed a knee brace, but this does not appear in the record. She wore a brace on her right wrist at the hearing. She previously had carpal tunnel syndrome in that wrist, but the surgery to release the carpal tunnel syndrome was rated as successful (Exs. 1F/4 and 12F). She claims to have continued hand pain and difficulty gripping, but again her surgery was successful (Ex. 12F). She says that her feet swell, but examination found no synovitis or tenderness in the legs (Ex. 12F). She claims to have difficulty getting out of the house and says that she cries often. She does take amitriptyline and Zoloft for depression and has apparently received treatment since 2001 (Ex. 12F). However, her insight and judgment are rated as intact and her mood and affect were normal during her last medical examination (E. 13F). She claims to have difficulty concentrating, but the doctor says that her recent and remote memories are intact (Ex. 13F). The claimant has failed to establish that her depression has more than minimal effect on her ability to perform work related activities. She says that she does not do much housework, but both her mother and son are disabled. She lives with her son in a trailer on her mother's property. She says that her hypertension is adequately controlled on her current medications. She uses a nebulizer at least once a day for asthma, but has apparently not returned for the spirometry testing recommended if her asthma symptoms continued (Ex. 13F). She has had physical therapy, chiropractic treatments and did water aerobics to treat her condition. She takes multiple medications to control her various medical conditions (Ex. 6E). She does not complain of side effects. I conclude that the claimant has some pain associated with her osteoarthritis and complicated by her obesity, but that she exaggerates the limitations she experiences. In making this determination I have considered applicable case law and regulations, including 20 CFR § 416.929.
>
> Accordingly, the undersigned finds the claimant retains the following residual functional capacity: she can list (sic) 10 pounds occasionally; sit for two hours at a time, up to six hours per day; and perform the occasional standing and walking required by sedentary work. She experiences increased pain with heavy exertion, but retains the ability to perform lighter activities (Ex. 2F). The state agency doctors, after reviewing the medical record, concluded that the claimant retained the capacity for even light work on a sustained basis (Ex. 6F). Although she claims to have manipulative difficulties, these are not documented in the record before me.

Tr. 15-16. The ALJ's decision indicates he determined Duncan's RFC based on more than the physical therapist's March 6, 2000 evaluation and Dr. Yoder's November 20, 2001 RFC assessment. Tr. 170-177. The ALJ considered Duncan's past medical history, specifically noting that (1) her December 29, 2000 x-rays (Tr. 118) showed minimal degenerative changes in the thoracic and lumbar spine with possible musculoskeletal spasms, (2) the July 28, 2000 MRI (Tr. 120) of her brain indicated only sinus disease, (3) the examination and testing by the neuro-

6

ophthalmologist were normal (Tr. 129), (4) her treating physician opined her elevated TSH was due to noncompliance, (5) Dr. Art Snyder's October 30, 2002 evaluation indicated that in August 2002 she had surgery for her carpal tunnel of the right hand which was successful (Tr. 186-187), (6) Dr. Snyder ordered further testing to rule out sleep apnea and osteoporosis, and (7) her treating physician assistant evaluated her for complaints of increasing asthmatic symptoms. Tr. 14-15. Duncan's medical records support the ALJ's findings and indicate as follows:

On December 4, 1996, Duncan saw Dr. Skee, her primary care physician, for complaints of chest discomfort and left arm and shoulder discomfort. Tr. 150-151. At that time, Duncan also complained of bilateral headaches but denied a family history of migraine headaches. Duncan complained that the headaches occurred weekly, lasted for several days, and were accompanied by blurred vision and nausea. *Id.* Duncan also complained of feeling "run-down and fatigued." Dr. Skee noted, "With the amount of work that she does, it is amazing that she has not had more problems with this." *Id.*

Dr. Skee performed a physical examination which was unremarkable. Duncan had a high blood pressure reading. Therefore, Dr. Skee prescribed medication for hypertension. Dr. Skee diagnosed Duncan with muscle spasm and ordered a thyroid profile.

On December 17, 1996, Duncan returned for her follow-up visit. Tr. 150. Duncan complained of fatigue but had no other complaints. Duncan's TSH was abnormal. Therefore, Dr. Skee ordered Synthroid and instructed Duncan to return in five to six weeks. Tr. 150.

On January 28, 1997, Duncan returned for her follow-up. Tr. 149. Duncan reported she was "doing OK." Duncan reported breaking her right foot. Dr. Skee noted a "trace of pedal

edema of the left ankle," otherwise the examination was unremarkable. Dr. Skee ordered a thyroid profile and a renal profile. Dr. Skee continued the Synthroid for her hypothyroidism and the Lisinopril for her hypertension.

On March 18, 1997, Duncan saw Dr. Skee for congestion and cough. Tr. 150. Dr. Skee diagnosed Duncan with allergies and prescribed Claritin D 24.

On May 5, 1997, Duncan returned to see Dr. Skee with complaints of cold symptoms. Tr. 148. Dr. Skee diagnosed Duncan with an upper respiratory infection.

On September 15, 1997, Duncan saw Dr. Skee for allergy symptoms. Tr. 148. Dr. Skee administered a cortisone injection for her allergies. Tr. 148.

On October 3, 1997, Duncan returned to see Dr. Skee and received her influenza vaccination. Tr.148.

On October 31, 1997, Duncan returned to see Dr. Skee with complaints of sore throat. Tr. 148. Dr. Skee prescribed antibiotics.

On January 16, 1998, Duncan saw Dr. Skee and reported she had fallen and hit her face and left wrist. Tr. 147. Dr. Skee ordered x-rays and prescribed Motrin and Tylenol. The x-rays were negative for fracture of the left wrist but indicated there was "a possible small fracture of the distal nose." Tr. 146-147. Dr. Donald J. Stinar prescribed Motrin and Tylenol as needed. Dr. Stinar instructed Duncan to return in one week if she was not better.

On April 27, 1998, Dr. Skee evaluated Duncan for a productive cough of two days duration. Tr. 145. Duncan also reported she had been having "a few loose stools lately." *Id.* The physical examination was unremarkable. Dr. Skee prescribed Claritin D 24.

On January 29, 1999, Kirk L. Nelson, D.O., evaluated Duncan for complaints of headache, cough, and sore throat. Tr. 145. Duncan complained of "pressure-like sensations in her chest." *Id.* Dr. Nelson noted "scattered faint expiratory wheezes throughout all lung fields." Tr. 144. Dr. Nelson diagnosed her with asthmatic bronchitis and treated her accordingly.

On February 18, 1999, Dr. Janis saw Duncan for cough and shortness of breath. Tr. 143-144. Duncan continued to have a productive cough. Dr. Janis examined Duncan and found her lungs were clear. Nonetheless, Dr. Janis prescribed another antibiotic. Tr. 143.

On June 17, 1999, Duncan saw Dr. Janis for a sore throat. Tr. 143. The throat culture was positive for hemolytic streptococcus. Dr. Janis admitted her with a diagnosis of "impending peritonsillar abscess." *Id.*

On June 28, 1999, Duncan returned for her follow-up. Tr. 142. Dr. Skee noted Duncan was doing well as far as her peritonsillar abscess but was now complaining of low back pain. Dr. Skee's examination revealed "a little bit of muscle spasm." *Id.* Dr. Skee prescribed Naproxen (a nonsteroidal anti-inflammatory drug) 500 mg twice a day.

In November of 1999, Duncan returned to Dr. Skee's office and received her flu shot (Tr. 142) and was treated for a upper respiratory infection on two occasions. Tr. 141, 142.

On February 10, 2000, Duncan went in to have her blood pressure checked. Tr. 141. At that time, her weight was 281 lbs.

On February 16, 2000, Duncan saw Dr. Skee for her hypertension. Tr. 140. Dr. Skee noted a trace of pedal edema. Dr. Skee ordered a thyroid profile, a CBC, and a CMP.

On February 28, 2000, Duncan saw Dr. Skee and reported doing well. Tr. 139. She had lost ten pounds and weighed 271.5 lbs. Duncan complained of pain in her knees and ankles. Dr. Skee noted some degenerative changes in her joints but no acute arthritis. Dr. Skee also noted Duncan's TSH was still elevated. Dr. Skee increased the Synthroid to 100 mcg daily. Dr. Skee instructed Duncan to return in five weeks for a follow-up and further lab work.

On April 3, 2000, Duncan returned for her follow-up. Tr. 138. Dr. Skee noted Duncan had been going to the rehabilitation center for pool therapy. Duncan requested a note from Dr. Skee for more visits to the rehabilitation center. Her weight was 284 lbs. Dr. Skee noted Duncan had osteoarthritic symptoms. Dr. Skee ordered a thyroid profile.

On April 7, 2000, Duncan stopped to inquire about her lab results. Tr. 138. Her TSH was still elevated. Dr. Skee increased her Synthroid and instructed her to return in one month.

On May 1, 2000, Duncan returned to see Dr. Skee. Tr. 137. Duncan reported she was doing fine but complained of pain in the left ear. Dr. Skee's examination was unremarkable except for some tenderness in her left TMJ (temporomandibular joint). Dr. Skee advised her to take the Naproxen she had at home and told her to return in a few months.

On May 12, 2000, there is a notation indicating Dr. Skee did not want Duncan to continue physical therapy. Tr. 137.

On November 2000, Duncan returned for her follow-up with Dr. Skee. Tr. 136-137. Duncan reported the Naproxen did not help her arthralgias. Duncan complained of some left upper chest pain, shortness of breath, left hand weakness, left back pain and left flank pain. The abdominal examination was unremarkable. The neurologic examination was unremarkable. Dr.

Skee opined the left sided pain was musculoskeletal. Dr. Skee ordered lab work but made no changes to her treatment. Dr. Skee instructed Duncan to return in four weeks.

On December 29, 2000, Duncan returned for her follow-up. Tr. 135. Duncan was still complaining of left flank pain. The examination of her back and abdomen was unremarkable. Dr. Skee prescribed Darvocet for the pain.

On February 9, 2001, Duncan returned to see Dr. Skee. tr. 134. Duncan complained of cold symptoms. A physician assistant (PA) assessed her as having cold symptoms but questioned whether it was seasonal allergies. The PA prescribed Allegra 60 mg and instructed her to return as needed.

On March 19, 2001, Duncan returned for her follow-up. Tr. 134. Duncan complained of back pain in the upper and lower back. On examination, Dr. Skee noted muscle spasms of her upper back and neck area, bilaterally, worse on the left. The were no acute signs of arthritis and no peripheral edema. Dr. Skee instructed Duncan on care of her back and directed her to return in a few months.

On July 6, 2001, Duncan returned to see Dr Skee. Tr. 132. Duncan reported having headaches, blurred vision, lightheadedness, dizziness, and poor balance. She complained that her feel felt numb at times and occasionally hurt. Dr. Skee noted Duncan had loose stools on occasion. The physical examination was unremarkable. Dr. Skee ordered a CT scan of the head and lab work.

On July 16, 2001, Duncan returned for her follow-up. Tr. 130. Dr. Skee noted the CT scan was normal, her sed rate was mildly elevated, and the TSH was elevated. Otherwise, the other lab work was normal. The physical examination was unremarkable. Dr. Skee ordered an

MRA of the brain to look for signs of multiple sclerosis.  Dr. Skee also noted Duncan had an appointment with Dr. Carlow, a neuro-ophthalmologist in Albuquerque on August 9th.  Duncan also was going to see Dr. Jain, a neurologist.  Dr. Skee increased her Prinivil (indicated in the treatment of hypertension), increased her Synthroid, and advised her to return in six weeks.

On August 27, 2001, Duncan returned for her follow-up.  Tr. 129.  Duncan had seen Dr. Carlow and reported her tests were normal.  Duncan also reported she had see Dr. Jain and was prescribed medication for her headaches.  Duncan complained of pain over her right maxillary sinus.  Dr. Skee prescribed an antibiotic and instructed her to return in three months.

On September 6, 2001, Dr. Skee noted he had received Duncan's TSH results.  Tr. 128.  The TSH was 14, which was elevated.  However, her last TSH done in July was 8.94.  Dr. Skee noted, "Despite the higher dose of Synthroid, the TSH has gone up.  I suspect that this may be primarily due to noncompliance."  *Id.*

On October 30, 2002, Dr. Snyder, a specialist in the area of arthritis and osteoporosis, evaluated Duncan for complaints of severe lower back pain as well as pain in the shoulders, neck, and feet.  Tr. 186-189.  Dr. Snyder's examination indicated Duncan had "mild osteoarthritis [ ] in the hands and the joints of the wrist, elbows, shoulders, hips, knees, and ankles."  Tr. 187.  Dr. Snyder found no synovitis or tenderness in the lower extremities.  The knees had slight crepitus.  Dr. Snyder diagnosed Duncan as "suspicion for osteoarthritis."  *Id.*  Dr. Snyder noted, "I am uncertain as to what the process is that is effecting Ms. Duncan underneath some of her regular problems.  Will search for immune dysfunction, as there are multiple clues."  *Id.*

Dr. Snyder ordered several diagnostic tests.  Dr. Snyder ordered a T3, T4, and a TSH.  Tr. 190-191.  Duncan's T3 was 52, which is low.  The normal range is 69 to 148 ng/dl.  Tr. 191.

Duncan's T4 was 5.0, which is within the normal range. The normal range is 5.0-12.0 ug/dl. Duncan's TSH was 14.83, which is high. The normal range is .38-4.73. However, on December 16, 2002, Duncan's T3 was 119, which is within normal limits. Tr. 195. Her TSH was .70, also within normal limits.

Dr. Snyder also ordered several tests to rule out an autoimmune disorder. The Cardiolipin ABIgG was slightly elevated which was not clinically significant. Tr. 188.

On August 17, 2001, Dr. Pawan Jain, a neurologist, evaluated Duncan. Duncan complained of intense headaches. Duncan reported her sister suffered from migraine headaches. Tr. 155. Dr. Jain prescribed medication for her headaches. Tr. 156.

On January 28, 2003, Duncan returned to her primary health care provider for a follow-up of her thyroid, asthma, and vaginitis. The medical notes indicate Duncan's physical examination was essentially "normal, except for morbidly obese." Tr. 193. At that time, the health care provider directed Duncan that "if asthma medications [were] not clearing up symptoms" she should "come in for spirometry testing." *Id.* The health care provider also noted Duncan had previously had a CT scan, MRI, MRA, and an evaluation by a neuro-opthalmologist when she complained of "visual disturbance, " and all these procedures and the evaluation had been negative. Tr. 192.

After discussing Duncan's past medical history, the ALJ then considered her activities of daily living. This was proper. Statements regarding daily activities are evidence properly considered under the Commissioner's regulations. *See* 20 C.F.R. § 416.929(a).
The ALJ noted Duncan cared for her handicapped son and wheel-chair bound mother. In fact, Duncan submitted a statement in which she detailed her daily activities. Tr. 97. Duncan stated:

> I would take care of [my son], and my grandmother who was a CVA patient and was confined to bed & wheelchair, and my mother who had cancer and various other illnesses. Its (sic) not as if I just stayed home and did nothing, I worked hard caring for every one, washing, cleaning, changing bandages, giving medications, taking everyone to their appointments, making everyone their different menus, lifting my grandmother to and from bed and wheelchair, lifting the wheelchairs in and out of the car, bathing everyone, etc.

Tr. 97. In the same statement, Duncan set forth all the reasons why "[t]he work that [she] could do with ease [was] so much harder and [why] it [took] her longer" to do the work. *Id.* The ALJ considered all the reasons (Tr. 97-98) Duncan alleged kept her from working. Tr. 16. As noted above, citing to the record, the ALJ discounted Duncan's subjective complaints to the degree alleged. For example, Duncan claimed she did very little housework. The ALJ discounted this allegation because her mother and son were disabled and she was responsible for their care. Duncan testified she had to go to the bathroom "about every half hour." Tr. 51. The ALJ discounted Duncan's testimony, finding it was not supported by the record. A review of the record supports this finding. On two occasions, Duncan complained of loose stools but there is no diagnosis of irritable bowel syndrome in the record.

Duncan's contention that "the report of the physical therapist simply does not support a residual functional capacity finding, <u>at any level</u>," also is not supported by the record. Pl.'s Mem. in Supp. of Mot. to Reverse at 12 (emphasis added). The record indicates that on March 6, 2000, Barbara Hill, a licensed physical therapist, performed an Initial Physical Therapy Evaluation. Ms. Hill noted:

> Has not been formally employed for 13 years, as she is the primary care giver for her dependent 75 year old mother who is wheel chair bound, recovering from abdominal C.A. and requires wound care, and weighs 380 lbs.; her dependent 94 y.o. grandmother, who has (L) hemiplegia due to multiple CVAs and is bed or chair bound, frail, dependent for all ADLs and feeding. Additionally, she is a single mother of a 14 y.o. son with medical problems, including seizure disorder. States she has no recreational outlets. She used to walk up to 2 miles per day for exercise, this decreased to 30 minute walks several years

ago due to her responsibilities, has stopped in past 2 months due to increased knee and back pain.

Tr. 124-125.  Ms. Hill assessed Duncan as displaying "signs and symptoms of DJD of cervical and lumbar spine, OA (osteoarthritis) of right elbow/wrist/foot and left greater than right knee with right upper extremity and left lower extremity as well as trunk weakness, complicated by gross morbid obesity and heavy ADL (activities of daily living) demands."  Tr. 125.  Ms. Hill opined Duncan's rehabilitation potential was "good for stated goals."  *Id.*  Ms. Hill prescribed eighteen treatments, twice a week for nine weeks.  The goals Duncan had to achieve were to (1) experience a 50 % decrease in overall pain intensity "per verbal pain scale after 8 treatments," (2) "demonstrate improved lumbo-pelvic stability with independent log roll sit to from supine and tolerance of supine position without subjective pain increase after 8 treatments," (3) "demonstrate improved left lower extremity mm strength and need stability to 5/5 all groups as needed to prevent falling at home during treatments 14-18," and (4) "demonstrate ability to ambulate 1000 feet without gait deviation or increased pain as needed for community access by discharge."  Tr. 126.  Ms. Hill did not opine Duncan was disabled.

After four weeks of physical therapy, the progress report indicates Duncan had not reached her goals.  Tr. 153.  The physical therapist noted:

> Pt. shows good motivation in therapy.  She has worked hard with cardiovascular program and is able to maintain HR (heart rate) in aerobic range for 20 minute intervals.  I feel she is motivated to reverse her chronic conditions of obesity and DJD (degenerative joint disease).  She will benefit from OT (occupational therapy) referral to assess right hand weakness and hypothenar swelling.  She would also benefit from diet counseling.

Tr. 153.  The physical therapist recommended Duncan continue in physical therapist.

And, although Duncan argues that "[t]he ALJ erroneously relied solely on the opinion of the non-examining DDS physician for his RFC finding," the record does not support her argument. Pl.'s Mem. in Supp. of Mot. to Reverse at 14 (emphasis added). On November 20, 2001, Dr. Yoder, a non-examining agency consultant, completed a Physical Residual Functional Capacity Assessment form. Tr. 170-177. Dr. Yoder opined Duncan could occasionally lift and/or carry 20 pounds, frequently lift and/or 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and/or pull unlimited. Tr. 171. Dr. Yoder summarized the medical evidence of record and opined "the overall evidence is consistent with a light RFC." Tr. 172. Dr. Yoder noted, "Amazingly, this woman has been taking care of her disabled mother (who reportedly weighs over 300 pounds) and her grandmother, both of whom need wheelchairs. She has a son with frequent seizures (14 y/o). This is a medium to heavy job and I believe that this is the reason that her joints and back bother her so much. This stress likely adds to the frequency of her migraine headaches." *Id.*

The record indicates Dr. Yoder was one of many factors considered by the ALJ in determining Duncan's RFC. The Court has reviewed the record and finds substantial evidence supports the ALJ's RFC determination. It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner. *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).

**B.  Credibility Determination**

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence she relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider her personal observations of the claimant in her overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  The inability to work pain-free is not sufficient reason to find a claimant disabled.  *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

The ALJ found Duncan had "some pain associated with her osteoarthritis and complicated by her obesity, but that she exaggerates the limitations she experiences."  Tr. 16.  In his decision, the ALJ set forth substantial evidence to support his finding.  The ALJ found Duncan's allegation of irritable bowel syndrome not supported by the record, her complaints of headaches and visual problems had been evaluated and her MRI, visual fields, and other neurological tests were normal,

her thyroid tests continued to be abnormal but noncompliance was suspected, she complained of hand pain and difficulty gripping but her carpal tunnel release surgery was successful, her depression was being treated and minimally affected her ability to perform work related activities, she claimed she had difficulty concentrating but her treating physician's medical notes did not indicate any problems with her concentration, and her asthma was controlled with treatment. The Court has meticulously reviewed the record and finds it supports the ALJ's findings. As required by Tenth Circuit law, the ALJ affirmatively linked his credibility findings to substantial evidence. The Court will not upset an ALJ's credibility determination where, as here, it is supported by substantial evidence. *Kepler*, 68 F.3d at 391.

**Conclusion**

Based on the record as a whole, the Court finds the ALJ's RFC determination and his finding that Duncan was not wholly credible is supported by substantial evidence. The Court's review of the ALJ's decision, the record, and the applicable law indicates the ALJ's decision adheres to applicable legal standards and is supported by substantial evidence. Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**